**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**GARTH MORRIS,**

          **Plaintiff,**

    **v.**

**COMMISSIONER OF SOCIAL
SECURITY,**

          **Defendant.**

        **Civil Action 2:17-cv-623
Judge Michael H. Watson
Magistrate Judge Jolson**

## REPORT AND RECOMMENDATION

Plaintiff Garth Morris filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his Title II Disability Insurance Benefits application. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED**, and that judgment be entered in favor of Defendant.

## I.      BACKGROUND

Plaintiff filed an application for Title II benefits, alleging disability onset on September 15, 2010. (Tr. 74, PAGEID #: 132; Tr. 206–07, PAGEID #: 264–65; Tr. 224, PAGEID #: 282) Plaintiff's last-insured date is December 31, 2013. (Tr. 74, PAGEID #: 132). The agency denied Plaintiff's claims initially and upon reconsideration (Tr. 143–45, PAGEID #: 201–03; Tr. 149–55, PAGEID #: 207–13). Plaintiff filed a Request for Hearing (Tr. 162–63, PAGEID #: 220–21), and an administrative hearing was held before Administrative Law Judge Michael Hellman (the "ALJ"). (Tr. 87–125, PAGEID #: 145–83). The ALJ denied Plaintiff's claim in a decision issued on March 2, 2016. (Tr. 74–83, PAGEID #: 132–41). The Appeals Council denied

Plaintiff's request for review, adopting the ALJ's decision as the Commissioner's final decision. (Tr. 1–6, PAGEID #: 59–64).

Plaintiff filed this case (Doc. 1), and the Commissioner filed the administrative record. (Doc. 9). Plaintiff filed a Statement of Specific Errors (Doc. 10), the Commissioner responded (Doc. 12), and Plaintiff filed a reply (Doc. 12).

**A. Relevant Hearing Testimony**

Plaintiff testified that he is claiming disability beginning on September 15, 2010, and his physical pain and depression began in 2008, the same year he was laid off. (Tr. 92–93, PAGEID #: 150–51). Before that, from 1998 until 2008, he worked as a semi-tractor and trailer driver, hauling glass tubes. (Tr. 93, PAGEID #: 151). After he lost his job, Plaintiff received unemployment benefits for a time and searched for employment as a truck driver. (Tr. 94, PAGEID #: 152). He did not seek out other types of work. (Tr. 95, PAGEID #: 153).

Plaintiff testified that he began receiving treatment for the pain in his back and neck around 2009. (*Id.* (testifying that treatment began "[s]omewhere in that area")). He had "severe" pain in his lower back that felt like "a big knot at the bottom of [his] spine," and a "grinding" in his neck. (Tr. 96, PAGEID #: 154). Plaintiff testified that in (or around) 2013, medical providers took x-rays of his neck, back, hips, and knees. (*Id.*). When asked why it took four years for x-rays to be taken, Plaintiff did not know. (Tr. 98–99, PAGEID #: 156–57). Plaintiff testified, however, that during that four-year period, medical providers prescribed pain medication. (Tr. 99, PAGEID #: 157). In 2014, Plaintiff was referred to a bone specialist and underwent testing. (Tr. 102, PAGEID #: 160). Plaintiff testified that "those tests really don't show much." (Tr. 103, PAGEID #: 161).

Regarding his asthma, Plaintiff testified that he was diagnosed at age 16. (Tr. 104, PAGEID #: 162). He has never gone to the emergency room with breathing complaints, and Plaintiff testified that his asthma medication regimen is the same now as when he was working. (*Id.*). He testified, however, that he now gets winded more easily than he used to. (Tr. 104–05, PAGEID #: 162–63).

Plaintiff testified that he also has "tremendous" pain in his hips and back. (Tr. 105, PAGEID #: 163). That pain also began around 2009. (Tr. 106, PAGEID #: 164). And, in 2013, x-rays were taken. (*Id.*). Plaintiff testified that he was in rehabilitation for about six weeks, but "it was doing more harm than good"; after his sessions, he "couldn't hardly walk." (Tr. 107, PAGEID #: 165). He took medication and, "on occasion," used a cane. (Tr. 108, PAGEID #: 166). Plaintiff estimated that "on occasion" meant three times per week. (*Id.*). Plaintiff testified that he needs to use the cane to walk up his road, which is roughly 400 feet and at a slight incline. (Tr. 108–09, PAGEID #: 166–67). Plaintiff testified that this difficulty began in 2013. (*Id.*). While giving this testimony, Plaintiff needed to take a break to compose himself. (Tr. 109, PAGEID #: 167).

In response to his lawyer's questioning, Plaintiff testified that he has degenerative disc disease, hypertension, osteoarthritis, and back spasms. (Tr. 111–13, PAGEID #: 169–71). He also testified that he struggled to sit comfortably for more than 15 to 20 minutes. (Tr. 114, PAGEID #: 172). At this point in the hearing, Plaintiff addressed the ALJ, asking him if he'd noticed that Plaintiff had been "shuffl[ing] around in his seat." (*Id.*). The ALJ responded no. (*Id.*). Plaintiff testified that he can stand for "maybe a half-hour." (*Id.*). If he attempts to walk any longer, he "would probably fall down." (Tr. 115, PAGEID #: 173). Plaintiff did not remember if a walking assistive device was prescribed for him. (Tr. 114, PAGEID #: 172).

With regard to climbing stairs, Plaintiff testified that he has "to take them in sections," breaking between every few stairs. (Tr. 115–16, PAGEID #: 173–74). Plaintiff estimated that he can lift 50 pounds once and 20 pounds repeatedly. (Tr. 116–17, PAGEID #: 174–75). He cannot, however, lift his arms above his head, and he has a weak grip. (Tr. 117, PAGEID #: 175). Plaintiff testified that he has good days and bad days; on a bad day, he needs to use a motorized cart at the grocery store. (*Id.*). He also testified that he cannot clip his own toenails. (Tr. 118, PAGEID #: 176). Plaintiff told the ALJ that he would love to go back to work and misses felling trees with his father, like he used to do. (Tr. 119, PAGEID #: 177).

### B. Relevant Medical Evidence

As noted, Plaintiff's last-insured date is December 31, 2013. (Tr. 74, PAGEID #: 132). He accordingly must establish disability on or before that date in order to be entitled to a period of disability and disability benefits. (*Id.*). The ALJ gave Plaintiff "the benefit of [the] doubt," and considered medical evidence that post-dates the last-insured date to find medically determinable impairments of degenerative disc disease and degenerative joint disease. (Tr. 78, PAGEID #: 136). This Court does likewise. However, for the reasons explained below, the undersigned does not consider evidence that was not before the ALJ.

*1. Degenerative Joint Disease and Degenerative Disc Disease*

With regards to Plaintiff's degenerative joint disease and degenerative disc disease, the medical evidence shows routine visits to his general practitioner for complaints of left arm pain and shoulder pain from Plaintiff's alleged onset date until his last-insured date. (*See generally* Tr. 266–78, PAGEID #: 324–36). During these visits, Plaintiff had varying complaints of pain in his arm/shoulder, wrists, back, and neck. (*Id.*).

On May 19, 2010, for instance, he reported that he believed he may have arthritis because all of his joints hurt. (Tr. 269, PAGEID #: 327). He noted during that appointment that he "[could not] find a job that suits him." (*Id.*). During that visit, he also reported mowing the grass. (*Id.*). On November 11, 2010, Plaintiff returned to his general practitioner for a blood pressure check. (Tr. 270, PAGEID #: 328). During that visit, he told nurse practitioner Donna Mayer that he was "unable to find any work driving a truck" and he was "financially a mess." Plaintiff did not report any complaints of joint pain. (Tr. 270, PAGEID #: 328). A record dated January 17, 2011 shows, *inter alia*, that Plaintiff had been having arm and shoulder pain for one week, which was "keeping him awake at night"; he had "intact grips equal and strong"; and Vicodin and was prescribed. (Tr. 272, PAGEID #: 330).

During a June 13, 2011 visit, Plaintiff presented with complaints of joint pain in his shoulders and wrists and other joints, including his low back and bilateral knees. (Tr. 274, PAGEID #: 332). He reported that he took ibuprofen when the pain was severe, but it did not really help. (*Id.*). The musculoskeletal examination during this visit revealed findings of tenderness but no evidence of swelling, ecchymosis, or crepitus of the cervical spine, bilateral shoulders, hips, or bilateral knees. (*Id.*). The report revealed diagnoses of neck strain, shoulder strain, knee pain, and joint pain. (*Id.*). Plaintiff was prescribed Naproxen. (*Id.*).

On July 19, 2011, Plaintiff stated was doing "pretty good," and that the sharp pain was gone. (Tr. 275, PAGEID #: 333). He reported that he was going to "hold off" on getting x-rays. (*Id.*). The examination noted tenderness of the lumbar spine but no evidence of swelling, ecchymosis or crepitus of the bilateral shoulder. (*Id.*).

Over a year later, at a September 13, 2013 visit, Plaintiff reported hip and ankle pain without associated numbness or tingling in the extremities and denied any injuries to the area.

Plaintiff alleged having pain in his back, neck, and shoulders. X-rays once again were recommended, but Plaintiff reported that he did not have money for x-rays and did not want to get them. (Tr. 276, PAGEID #: 334).

Two months later, in November of 2013, Plaintiff reported that his pain was worsening. (Tr. 278, PAGEID #: 336). Specifically, he reported having weak grip strength and occasional muscle cramps. (*Id.*). He also reported that he took 800 mg of ibuprofen three times a day as well as Tramodol for pain relief. (*Id.*). Plaintiff noted continued low back-pain, ankle, and knee pain. (*Id.*). He described hearing a "grinding" sound when he moved his neck and reported intermittent "hot poking" pain in his left arm. (*Id.*). An examination revealed tenderness but no swelling, ecchymosis, or crepitus of the lumbar spine or bilateral hips and knees. (*Id.*).

After his last-insured date, in March 2014, Plaintiff had x-rays. (Tr. 296, PAGEID #: 354). Those x-rays revealed "[d]egenerative disc space narrowing" at C4-C5 and, more so, at the C5-C6 level; and neural foramina encroachment was seen at the C5-C6 level bilaterally. (*Id.*). Plaintiff also had x-rays of the lumbar spine, which revealed findings of spurring at the inferior aspect of L4 and L5. (Tr. 301, PAGEID #: 359). An x-ray of Plaintiff's shoulders at this same time showed downsloping acromion variation that may impress upon the rotator cuff, but "[n]o advanced degenerative changes," "[n]o AC joint widening or prominent soft tissue calcifications," and "[n]o acute bilateral shoulder abnormality." (Tr. 305, PAGEID #: 363). Later diagnostic studies, in June 2014 and April 2015, revealed "minor" osteoarthritis process in the right hip and "mild" degenerative disc disease of the lower lumber spine without significant stenosis. (Tr. 348, PAGEID #: 406; Tr. 363, PAGEID #: 421). These x-rays revealed no other abnormalities in the left hip or knees.

(*See generally* Tr. 348, PAGEID #: 406; Tr. 350, PAGEID #: 408; Tr. 352, PAGEID #: 410; Tr. 354, PAGEID #: 412; Tr. 362–63, PAGEID #: 420–21).

   *2. Asthma*

The records show diagnosis for asthma and chronic obstruction without asthmaticus. (Tr. 274, PAGEID #: 332).   Treatment reports have shown that Plaintiff had clear lungs to auscultation bilaterally, with no dyspnea, wheezing, rales or rhonchi.  (Tr. 274–75, PAGEID #: 332–33; Tr. 307, PAGEID #: 365).   While Plaintiff reported some distress during strenuous activity, he denied shortness of breath, nausea, vomiting, or diaphoresis.   (Tr. 270, PAGEID #: 328; Tr. 272–74, PAGEID #: 330–32; Tr. 276, PAGEID #: 334).  According to a March 19, 2014 spriometry report, the findings were within normal limits.  (Tr. 307, PAGEID #: 365).

## C.  The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements through December 31, 2013, and that he has not engaged in substantial gainful activity since September 15, 2010.  (Tr. 76, PAGEID #: 134).   The ALJ determined that Plaintiff suffers from the following severe impairments:  "degenerative disc disease, degenerative joint disease and asthma . . . ." (*Id.*).  At step three, the ALJ found that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of any of the impairments in the Listings of Impairments.  (Tr. 77, PAGEID #: 135).  The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work, except he:

> . . . could occasionally climb ladders, ropes, or scaffolds, frequently climb ramps and stairs, stoop, crouch, kneel, and crawl.  . . . had to avoid concentrated exposure to humidity, environmental irritants (such as fumes, odors, dusts and gases), poorly ventilated areas, and chemicals. . . . [and] had to avoid use of moving machinery and to unprotected heights.

(*Id.*).  At step four of the sequential evaluation, the ALJ concluded that Plaintiff was not capable of performing any of his past relevant work.  (Tr. 81, PAGEID #: 139).  At step five, the ALJ found that Plaintiff was not disabled because there were a significant number of jobs in the national economy which Plaintiff could perform, including the jobs of cashier, inspector-packer, and assembler.  (Tr. 82, PAGEID #: 140).

## II.  STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).  The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  To that end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *Rhodes v. Comm'r of Soc. Sec.*, No. 1:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.  DISCUSSION

Plaintiff has assigned six errors.  The undersigned considers each in turn.

### A.  Medical Listings 1.02 (dysfunction of major joints), 1.04 (disorders of the spine), and 3.03 (asthma)

As a threshold matter, Plaintiff's first assigned error is notably undeveloped.  Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis, 20 C.F.R. § 404.1520(a)(4)(iii).  Consequently, fitting a claimant into a listing is dispositive and thus demands a higher level of proof:  Listed impairments preclude any

gainful activity, not just substantial gainful activity. *See Sullivan v. Zebley*, 493 U.S. 521, 525 (1990); 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing provides "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id.*; *see also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Alternatively, medical equivalence of a listing can occur in three situations where the claimant fails to meet all of the criteria:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526; 20 C.F.R. § 414.926).

Because the burden is high, "[w]hen a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) (citation omitted). "A claimant's failure to specifically detail, in a point-by-point fashion, how he or she meets a listing waives that argument." *Dakroub v. Comm'r of Soc. Sec.*, No. 15-12484, 2016 U.S. Dist. LEXIS 133464, at *26 (E.D. Mich. Aug. 1, 2016).

Here, Plaintiff vaguely cites three listings, namely Listings for 1.02 (dysfunction of major joints), 1.04 (disorders of the spine), and 3.03 (asthma) without any explanation of how the listing requirements are satisfied. For instance, with regard to Listing 1.02(A), Plaintiff does not

specify a major peripheral weight-bearing joint, nor does he cite to evidence demonstrating an inability to ambulate effectively, as described in the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02(A). Similarly, Plaintiff does not specify a major peripheral joint in each upper extremity, nor does he refer to evidence of an inability to perform fine and gross movements effectively as Listing 1.02(B) requires. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02(B). Moving to Listing 1.04, Plaintiff does not provide evidence demonstrating nerve root compression characterized by neuro-anatomic distribution of pain, sensory or reflex loss, positive straight leg raising, spinal arachnoiditis, lumbar stenosis resulting in psedoclaudication, or an inability to ambulate effectively. *See generally* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A)–(C).

In an apparent effort to demonstrate that he satisfies Listing 3.03, Plaintiff states that "[h]e is no longer able to walk up the hill at his father's house[.]" (Doc. 10 at 9). Although Plaintiff cites his hearing testimony for this proposition, it doesn't support his claim. Rather, Plaintiff testified twice at the hearing that he "get[s] winded," when walking up the hill at his father's house. (Tr. 104–05; PAGEID #: 162–63). There is a meaningful difference between being unable to walk up a hill and feeling short of breath after traversing an incline. In any event, Plaintiff fails to cite any evidence of chronic asthmatic bronchitis or attacks in spite of prescribed treatment requiring listing level interventions. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.03(A)–(B).

Put simply, Plaintiff has left the Court to scour the record to support his claim rather than articulate how any of the Listings is satisfied. Such an insufficient and undeveloped argument is waived. *See Crocker v. Comm'r of Soc. Sec.*, No. 1:08-cv-1091, 2010 WL 882831, at *6 (W.D. Mich. 2010) ("This court need not make the lawyer's case by scouring the party's various

submissions to piece together appropriate arguments.") (citation omitted); *Mortzfield v. Comm'r of Soc. Sec.*, No. 12-15270, 2014 WL 1304991, at *14 (E.D. Mich. Mar. 31, 2014) ("Plaintiff bears the burden of establishing that he meets a particular listing and plaintiff's argument in this regard is not sufficiently developed such that the undersigned can make such a determination. Plaintiff cannot simply make the bald claims that the ALJ erred, while leaving it to the Court to scour the record to support this claim."); *Dakroub*, 2016 U.S. Dist. LEXIS 133464, at *26 ("[Plaintiff's] claim that he meets Listing 1.04(A) is thus waived, because he makes no effort whatsoever to point to specific evidence in the record demonstrating that he meets the multifactor criteria listed in that subsection.").

Further, even if this Court were to consider the first assigned error on its merits, the Plaintiff's arguments in support are confounding. For example, Plaintiff asserts repeatedly that the ALJ "failed to consider" whether Plaintiff met or equaled the Listings for 1.02, 1.04, or 3.03. (Doc. 10 at 7; *see also id.* ("[T]he ALJ does not even discuss [Listings 1.02, 1.04, or 3.03].")); *id.* at 8 ("[T]he ALJ neglected to consider listings 1.02, 1.04, 3.03 . . . ."); *id.* at 9 ("Had the ALJ considered Listings 1.02, 1.04, and 3.03, he should have found [Plaintiff to be disabled . . . .")). Plaintiff likewise expresses exasperation with the ALJ, asserting that "astonishingly the ALJ only considered listings guidance regarding obesity and hypertension . . . ." (*Id.* at 8). In support, Plaintiff cites cases where the ALJ failed even to mention a relevant listing. (*Id.* (citing *Rodriguez v. Colvin*, No. 1:14CV1623, 2015 U.S. Dist. LEXIS 119133, at *12 (N.D. Ohio July 20, 2015); *Christephore v. Comm'r of Soc. Sec.*, No. 11-13547, 2012 U.S. Dist. LEXIS 83978, at *19 (E.D. Mich. June 18, 2012)).

Those cases are not like this one. Here, the ALJ expressly stated in his opinion that he considered Listings 1.02, 1.04, and 3.03, but found them unmet:

I have considered Section Listings 1.02 (dysfunction of major joints), 1.04 (disorders of the spine), and 3.03 (asthma). However, I find no evidence of listing level impairment with consideration given to the above listings or any other listed impairment identified in 20 CPR Part 404, Subpart P, and Appendix 1. The claimant does not manifest clinical signs and findings that meet the specific criteria of any listing. In reaching this conclusion, I considered the opinions of the State Agency medical consultants who reviewed the claim at the time of adjudication initially and on reconsideration (20 CFR 404.1527 and Social Security Ruling 96-5p).

(Tr. 77, PAGEID #: 139).

In her Response Brief, the Commissioner notes Plaintiff's mistake: "Plaintiff is incorrect; the ALJ expressly considered each of those listings but found no evidence of a listing level impairment (Tr. 77)." (Doc. 11 at 3). Plaintiff does not concede error in his Reply brief; instead, he again cites inapplicable law. Specifically, he relies on *Vaughan v. Comm'r of Soc. Sec.*, No. 2:16-cv-454, 2017 U.S. Dist. LEXIS 82964 (S.D. Ohio May 31, 2017), to argue that remand is required. (Doc. 12 at 1). But just like in the other cases cited, the error in *Vaughan* was failure to mention the relevant listing at all. *Id.* at 14 (noting that "Plaintiff argues that the failure to mention Section 1.04 is reversible error.").

Plaintiff also incorrectly contends that the ALJ "failed to report any functional capacity limitations due to [his] asthma." (Doc. 10 at 9). Indeed, the fashioned RFC took Plaintiff's asthma into account, noting that Plaintiff must "avoid concentrated exposure to humidity, environmental irritants (such as fumes, odors, dusts and gases), poorly ventilated areas, and chemicals." (Tr. 77, PAGEID #: 135).

Finally, the undersigned's independent review of the record reveals no basis to conclude that the ALJ erred in finding these Listings unsatisfied. The Sixth Circuit has emphasized that an ALJ is not subject to a "heightened articulation standard" in considering the listing impairments. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). Instead, the Court simply reviews

whether substantial evidence supports the ALJ's findings. *See id.* In doing so, "a court must read the ALJ's step-three analysis in the context of the entire administrative decision, and may use other portions of a decision to justify the ALJ's step-three analysis"). *Snoke v. Astrue*, No. 10-1178, 2012 WL 568986, at *6 (S.D. Ohio Feb. 22, 2012). Considering the whole opinion, the ALJ offered reasons why the record evidence does not satisfy these Listings. (Tr. 76–79, PAGEID #: 134–37 (detailing medical evidence)). Thus, it is recommended that Plaintiff's first assignment of error be overruled.

## B. Assessment of John Miller's Opinion

Plaintiff next argues that the ALJ erred by not giving any weight to the opinion of John Miller, a nurse practitioner. (Doc. 10 at 9–13). The ALJ had this to say about Mr. Miller's opinion:

> The claimant offered the opinions of John Miller, CRNP, to whom learned counsel kept referring on the record and in his memorandum as "Dr. Miller." However, I do not see evidence that he possesses a doctorate of any kind (Exhibit 7F). I give no weight to the opinions that Mr. Miller expressed. In this case, I find Mr. Miller only saw the claimant on three occasions during the period in issue: June 13, 2011, September 13, 2013 and November 26, 2013. Mr. Miller opined that the claimant had degenerative joint disease of the cervical spine that caused symptoms of low back pain radiating into both legs, and neck pain radiating into both shoulders. Mr. Miller indicated that the claimant had pain in the cervical and lumbar spine to palpation throughout. Mr. Miller also opined that due to his pain the claimant would only be able to sit 15 minutes and stand for 20 minutes in an 8-hour workday. He stated the claimant would only be able to sit, stand/ walk only 2 hours in an 8-hour workday. Mr. Miller opined that the claimant would need a sit, stand option during an 8-hour work day and he would need the opportunity to take walks every 20 minutes for up to 5 minutes throughout an 8 hour workday. Mr. Miller also indicated that the claimant would need to use a cane or other hand held devices due to imbalance. Mr. Miller opined that the claimant should only occasionally lift 20 pounds but never lift 50 pounds. The claimant should rarely twist, stoop and climb stairs and never crouch/squat or climb ladders. Mr. Miller further opined that due to his impairments the claimant should be expected to miss four or more days a month from work. I find that the clinical findings do not support the extent of limitations Mr. Miller assessed. At most, he found that there was musculoskeletal tenderness but nothing more. He found no gait or neurological

deficit. Mr. Miller stated that the claimant needed to use a cane. The claimant did not attend the hearing with a cane in hand. Mr. Miller did not refer the claimant to specialist during the period in issue. The claimant was not hospitalized for any reason. The opinion regarding absences was excessive in light of the routine nature of the mere three visits the claimant had with him during the three-year period in issue.

(Tr. 81, PAGEID #: 139).

As a nurse practitioner, Mr. Miller is not an "acceptable medical source" pursuant to Social Security Ruling SSR 06-03P; instead he is an "other source." *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939.[1] "Other sources" cannot establish the existence of a medically determinable impairment but "may provide insight into the severity of the impairment and how it affects the individual's ability to function. *Id.* at *2. The ruling notes that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners . . . have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists." *Id.* at *3. Such opinions are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file." *Id.* at *4. Accordingly, the ruling explains that opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion. *Id.* at *4–5. Finally, the ruling states that:

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the

---

[1] This regulation has been rescinded. It still applies, however, to claims (like this one) filed before March 27, 2017. 20 CFR § 404.1527.

adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03P, 2006 WL 2329939 at *6.

Plaintiff relies on *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532 (6th Cir. 2007), to argue that the ALJ's analysis of Mr. Miller's opinion was deficient under SSR 06-03P. (Doc. 12 at 8). But *Cruse* and this case are different. There, the Court noted that the "ALJ's only explanation for discounting [the nurse practitioner's] opinion was that '[the nurse practitioner] is neither a medical doctor nor a vocational expert, and thus lacks the credentials for making such a determination.'" *Cruse*, 502 F.3d at 541. The ALJ did not provide "any degree of specific consideration of [the nurse practitioner's] functional assessments." *Id.* Put simply, the ALJ in *Cruse* "did not give the opinion significant weight *or* explain his reasons for discounting [it]." *Id.* (emphasis added).

Here, in contrast, the ALJ considered and ultimately rejected Mr. Miller's opinion for record-based reasons. First, the ALJ found that Mr. Miller's own clinical findings did not support the extent of his opined limitations. (Tr. 81, PAGEID #: 139). As an example, the ALJ noted that Mr. Miller found, at most, that Plaintiff had musculoskeletal tenderness but otherwise made no significant findings like a gait or neurological deficits. (*Id.*; *see, e.g.*, Tr. 273, PAGEID #: 331; Tr. 276–79, PAGEID #: 334–37). That consideration was proper. The ALJ also considered that Mr. Miller stated that Plaintiff needed to use a cane, but Plaintiff did not have a cane at the hearing. (Tr. 81, PAGEID #: 139; *see, e.g.*, Tr. 393, PAGEID #: 451). Again, this analysis was in bounds. The ALJ also considered that Mr. Miller did not refer Plaintiff to any specialists during the relevant period, nor was Plaintiff hospitalized for any reason. (Tr. 81, PAGEID #: 139). The ALJ additionally noted that Mr. Miller treated the claimant relatively infrequently during the period at issue (June 13, 2011, September 13, 2013, and November 26,

2013). (*Id.*).[2] The ALJ found that, in light of the routine nature of those visits, Mr. Miller's opinion regarding Plaintiff's expected absences to be excessive. (Tr. 81, PAGEID #: 139). All of these considerations were appropriate. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); 20 C.F.R. § 404.1527(c)(4)("[T]he more consistent a medical opinion is with the record as a whole, the more weight we will give to that opinion."); 20 C.F.R. § 404.1527(c)(2)(i) (ALJ may consider treatment relationship in evaluating weight to give opinion).

In sum, the ALJ provided numerous reasons, consistent with the regulatory factors, for not crediting Mr. Miller's opinion. Although Plaintiff may disagree with the ALJ's final assessment of Mr. Miller's opinion, Plaintiff has not shown that it was outside the ALJ's permissible "zone of choice" that grants ALJs discretion to make findings without "interference by the courts." *Blakley*, 581 F.3d at 406.

## C. Development of the Record

In his third assigned error, Plaintiff alleges that the ALJ failed to develop the medical evidence fully. (Doc. 10 at 13–14, 18). The regulations provide, "[i]n general, you have to prove to us that you are . . . disabled. Therefore, you must bring to our attention everything that shows that you are . . . disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are . . . disabled, its effect on your ability to work on a sustained basis. We will consider only impairment(s) you say you have or about which we receive

---

[2] The record also includes a note from Mr. Miller dated July 19, 2011, which was during the period at issue (Tr. 274, PAGEID #: 332). At that visit, Plaintiff indicated he was doing "pretty good" (Tr. 275, PAGEID #: 333). At that examination, Plaintiff exhibited tenderness, but his other findings were generally normal. (*See id.*). Thus, although the ALJ did not consider the July 2011 visit, the findings during that examination were similar to the others expressly noted by the ALJ.

evidence." 20 C.F.R. § 404.1512(a). Put another way, "[t]he claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to benefits." *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) (citing *id.*). Further, the Sixth Circuit has held that an ALJ has a special, heightened duty to develop the record only in certain, limited circumstances. *Id.* (citing *Lashley v. Sec'y of Health & Human Servs.*, 709 F.2d 1048, 1051–52 (6th Cir. 1983)). Those circumstances include when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures. *Id.*

None of those circumstances are present here. Importantly, Plaintiff had representation at the hearing. In fact, the same counsel has represented Plaintiff throughout this litigation. Plaintiff now complains that there were outstanding medical records that the ALJ should have obtained, "especially those which counsel supplemented at the appeals stage." (Doc. 10 at 13). The ALJ, however, expressly asked Plaintiff's counsel whether there was additional information that he intended to submit, and Plaintiff's counsel responded no:

> ALJ: . . . Mr. Chapin, prior to the hearing, you wanted to make sure that I've got your brief and any additional information, which you sent in the last week. And I want to assure you that I have. Is there other information that you're intending to submit?

> ATTY: No, Your Honor. If you've received our prehearing brief, which is dated January 11th, and this physical medical source statement from Dr. Miller, those were the last two things we uploaded. And I don't believe we need to leave the record open. I don't think we're waiting on anything in this matter; no, we're not.

(Tr. 91, PAGEID #: 149).

Given the facts that Plaintiff had counsel and counsel represented that the record was complete, there was no error on the ALJ's part in not requiring further development of the record.

### D. Evaluation of Plaintiff's Subjective Complaints

Next, Plaintiff argues that the ALJ improperly engaged in "sit and squirm jurisprudence." (Doc. 10 at 14). The undersigned finds Plaintiff's argument disingenuous. At the hearing, Plaintiff himself raised this issue while answering his lawyer's questions:

> Q Okay. I want to ask you a few questions about your physical limitations. Do you have problems with sitting for any period of time?
> A Yes, sir.
> Q About how long can you sit before you need to stand?
> A Comfortably -- comfortably, I'd set for about 15-20 minutes comfortably . I got a -- I keep -- I don't know if you've noticed. But I keep switching positions enough to try to ease the pain in my back.
>
> ALJ: I haven't noticed.
>
> CLMT: But I've shuffled around in the seat. But, yeah, I can sit for about 15-20 minutes at a time comfortably.

(Tr. 114, PAGEID #: 172). Thus, Plaintiff asked the ALJ to take note of his demeanor at the hearing. Following this prompting, the ALJ noted the following in his opinion:

> The claimant contended that he was in somatic distress throughout the hearing, but I did not observe his distress, save one instance when I was questioning him intensely about the use of the cane. At the time, he and his attorney asked for a recess, the claimant exited the room quickly and without difficulty. He reentered the hearing room without difficulty and showed a willingness to answer questions freely.

(Tr. 80; PAGEID #: 138). Given the circumstances that led to this portion of the opinion, the undersigned rejects Plaintiff's argument.

Moreover, "observations of a claimant's behavior at a hearing are 'material, relevant, and admissible' factors for the ALJ's consideration." *Sorrell v. Comm'r of Soc. Sec.*, 656 F. App'x 162, 171 (6th Cir. 2016) (quoting *Martin v. Sec'y of Health and Human Servs.*, 735 F.2d 1008, 1010 (6th Cir. 1984)). The thrust of the "sit and squirm" admonishment is that an ALJ cannot rely *solely* on a claimant's demeanor during a hearing to dismiss allegations of pain. *Sorrell*, 656 F. App'x at 171–72.

Here, the ALJ based his evaluation of Plaintiff's subjective allegations on more than Plaintiff's demeanor at the hearing. For instance, in evaluating Plaintiff's subjective complaints, the ALJ discussed at length that the objective medical evidence failed to support Plaintiff's allegations of disabling limitations (Tr. 78–79, PAGEID #: 136–37); *see* 20 C.F.R. § 404.1529(c)(2) (objective medical evidence is a useful indicator to assist in making reasonable conclusions about the intensity and persistence of a claimant's symptoms). The ALJ also considered that a June 2011 musculoskeletal examination revealed findings of tenderness with no evidence of swelling, ecchymosis (escape of blood into the tissues from ruptured blood vessels), or crepitus noted of the cervical spine, shoulders, hips, or knees. (Tr. 78–79, PAGEID #: 136–37) (citing Tr. 274, PAGEID #: 332)). Likewise, according to a report from July 2011, Plaintiff was doing "pretty good." (Tr. 79, PAGEID #: 137) (citing Tr. 275, PAGEID #: 333). Again, the only significant musculoskeletal finding was tenderness. (*Id.*). In November 2013, despite complaints of worsening arthritic pain, Plaintiff did not have any swelling, ecchymosis, or crepitus of the lumbar spine, hips, or knees. (Tr. 79, 278, PAGEID #: 138, 336). The ALJ also considered that medical evidence failed to show clinical findings supporting Plaintiff's allegations of disabling asthma (Tr. 79, PAGEID #: 137). For instance, the ALJ considered that treatment notes indicated that on examination, Plaintiff's lungs were clear to auscultation bilaterally, and he had no dyspnea, wheezing, rales, or rhonchi (*Id.*; *see, e.g.*, Tr. 274–75, PAGEID #: 332–33). Also, in March 2014, a spirometry report was within normal limits. (Tr. 79, 307, PAGEID #: 137, 365).

In addition to the above-cited objective medical evidence, the ALJ also considered the following:

> Notably, at the hearing, the claimant was vague about the onset of his complaints and said that he had them even while he worked. He did not entirely explain

19

how his health was worse after he was laid off from his job and he admitted that he received unemployment compensation for a period. He was also somewhat vague in telling me why it took years for the providers to run tests to find out what was wrong with him. The truth was that the claimant did not or could not spend money for the tests (Exhibit 1F/ 11). However, his reticence with me eroded his credibility as his inability to be fully honest on that point led me to disbelieve him on larger points. His complaints of pain yielded nothing more than being put on Vicodin in November 2013. Though he claimed occasional use of a cane, his providers failed to observe him using one and he did not appear with one at the hearing. The evidence shows attended physical therapy evaluation and another doctor well after December 31, 2013. The claimant also told me he had depressive complaints that had their onset in 2008, but the documentation is silent on that point.

(Tr. 80, PAGEID #: 138).

These considerations were proper. *See* 20 C.F.R. § 404.1529(c)(3)(v) (providing that ALJ may consider a claimant's treatment as a relevant factor to consider in assessing severity and nature of symptoms); *Reynolds*, 424 F. App'x at 417 (noting that ALJ may discount disability allegations in part due to conservative treatment); *Engle v. Astrue*, No. 1:10-cv-83, 2011 WL 900999 at *8 (S.D. Ohio Feb. 23, 2011) ("[I]t is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence.") (citing *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004)).

It is the job of the ALJ, and not the reviewing court, to evaluate a claimant's subjective allegations of limitation. *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) ("Our role is not to . . . examine the credibility of the claimant's testimony."). Accordingly, an ALJ's finding regarding a claimant's subjective allegations is given great weight and great deference. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying.").

**E. Bias**

In his fifth assignment of error, Plaintiff alleges the ALJ acted in a biased manner toward him, thereby denying him his right to a full and fair hearing. (Doc. 10 at 16–18) (asserting that the ALJ exhibited a "deep seeded antagonism toward [Plaintiff]," repeatedly interrupted him, pressed him about specific information which was already established by the medical record, and blatantly discredited his testimony). He also notes that during the hearing, the ALJ made him cry. (*Id.*).

In evaluating Plaintiff's claim, this Court "must begin with the 'presumption that policy makers with decisionmaking power exercise decision-making authority with honesty and integrity.'" *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 363–64 (6th Cir. 2004) (quoting *Navistar Int'l. Transp. Corp. v. U.S. Envtl. Prot. Agency*, 941 F.2d 1339, 1360 (6th Cir. 1991)); *Bailey v. Comm'r*, 413 F. App'x 853, 856 (6th Cir. 2011) ("We presume that judicial and quasijudicial officers, including ALJs, carry out their duties fairly and impartially."); *Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 436 (6th Cir. 2010) (applying presumption that policymakers exercise their decision-making power "with honesty and integrity"). Importantly, "[t]he burden of overcoming the presumption of impartiality rests on the party making the assertion [of bias],' and the presumption can be overcome only with convincing evidence that a risk of actual bias or prejudgment' is present." *Id.* (citing *Schweiker v. McClure*, 456 U.S. 188, 196 (1982): *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Put another way, "any alleged prejudice on the part of the decisionmaker must be evident from the record and cannot be based on speculation or inference." *Id.*

Plaintiff has not carried his burden of establishing that the ALJ was biased. Plaintiff contends that the ALJ repeatedly interrupted him and pressed him about specific information which was already established by the medical record. (Doc. 10 at 17). Although Plaintiff does

not identify what questions he finds objectionable, here is an example of the ALJ questioning

Plaintiff about his pain and treatment:

> Q: Well, you said you first went in with complaints in 2009. What did they do for
> you in 2009?
>
> A: Well, I can't. I don't want to sound dumb, Your Honor. And I'm sorry. But I
> don't remember the dates. I might be off on the 2013 date; I don't know.
>
> Q: Well, I need to understand this. Because you're saying you became disabled
> and unable to work in September of 2010. And I want to understand what it is you
> were doing to help yourself to get relief.
>
> A: The only thing I was doing –
>
> Q: It's not a question of being dumb, sir. It's a question of me understanding
> what you were doing to get help.
>
> A: Yes, sir. I realize that. The only thing I was doing was going to the doctor.
> But as far as the dates, I can't really -- I don't want to say specifically, because I
> don't remember.
>
> Q: Well, if you can't give me specifics, then how am I to understand what you're
> trying to tell me?
>
> A: I don't know, sir.

(Tr. 100, PAGEID #: 158). The undersigned concludes that this line of questioning was not

inappropriate. The undersigned instead reads the ALJ's questions as seeking to understand the

nature and timing of Plaintiff's impairments. Further, although Plaintiff's counsel argues that the

medical record speaks for itself (Doc. 10 at 17), the ALJ has the right to probe the consistency of

Plaintiff's allegations and to compare those allegations to the evidence of record. *See generally*

SSR 16-3p, 2016 SSR LEXIS 4.

Further, to the extent that Plaintiff criticizes the ALJ's tone during the hearing, "judicial

remarks during the course of a trial that are critical or disapproving of, or even hostile to,

counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *See*

*Liteky v. United States*, 510 U.S. 540, 555–56 (1994). Plaintiff also contends that the ALJ's antagonism prevented Plaintiff from being fully heard. The record shows the opposite. The ALJ expressly told Plaintiff's counsel, "Sir, this is [Plaintiff's] hearing. My reasons for being here is to ask him questions so I can understand the situation the best I can." (Tr. 101, PAGEID #: 159). Finally, and most important, the Court has reviewed the hearing transcript as well as the ALJ's decision in this case and finds no evidence of bias.

### F. Post-Hearing Evidence

After the ALJ issued an unfavorable decision, Plaintiff submitted evidence to the Appeals Council, which included additional records from Mr. Miller from Perry County Family Practice. (Tr. 17–41, PAGEID #: 72, 99). This Court cannot consider evidence that was not before the ALJ for purposes of determining whether substantial evidence supports the final decision of the Commissioner; it may, however, consider that evidence to determine whether it merits remand pursuant to sentence six of 42 U.S.C. § 405(g). *See Cotton v. Sullivan*, 2 F.3d 692 (6th Cir. 1993). A social security case can be remanded "for further administrative proceedings" where "a claimant shows that the evidence is new and material, and that there was good cause for not presenting [the evidence] in the prior proceeding." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); 42 U.S.C. § 405(g) (sentence six). The party seeking remand has the burden to show that remand is appropriate. *See Oliver v. Sec'y of Health and Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986). The failure to establish any one of the three elements—new, material, and good cause—is fatal to the moving party's request. *See Glasco v. Comm'r of Soc. Sec.*, No. 15-3964, 2016 WL 1460384, at *2 (6th Cir. Apr. 14, 2016).

The Court begins with the good-cause requirement. To show good cause, a claimant must demonstrate a reasonable justification for failing to acquire and present the evidence before

the ALJ. *Foster*, 279 F.3d at 357. Simply obtaining evidence after the ALJ's decision is not enough. *See Oliver*, 804 F.2d at 966 ("[T]his circuit has taken a harder line on the good cause test; *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d [551,] 554 [(6th Cir. 1984)]. The Sixth Circuit held in *Willis* that in order to show good cause the complainant must give a valid reason for his failure to obtain evidence prior to the hearing."). Here, Plaintiff was aware that he had received treatment from Perry Family Practice, but he did not obtain the records until after the ALJ's decision. Plaintiff makes no effort to explain why neither he nor his attorney obtained such evidence prior to the ALJ's March 2016 decision. On this basis alone, remand is not warranted.

Further, evidence must be "new" to support a remand. "For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Id.* (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). The records were in existence at the time of the administrative hearing, and the undersigned concludes they are not "new." Accordingly, the undersigned finds Plaintiff's sixth assigned error to be meritless.

## IV. CONCLUSION

Based upon the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED**, and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo*

determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.

Date: April 25, 2018                    /s/ Kimberly A. Jolson
                                        KIMBERLY A. JOLSON
                                        UNITED STATES MAGISTRATE JUDGE